LAWRENCE H. BAKKEN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2327-67, 715-68.    Filed January 13, 1969.

Lawrence H. Bakken, pro se.
*Martin A. Schainbaum*, for the respondent.

TIETJENS, *Judge:* The Commissioner determined deficiencies in income tax of petitioner in the amounts of $349 and $394.48, respectively, for the years 1965 and 1966. We must decide whether petitioner may deduct certain educational expenses.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation and the exhibits attached thereto are incorporated herein by this reference.

At the time he filed his petition in docket No. 2327-67, Lawrence H. Bakken (hereinafter referred to as Lawrence) resided in Dublin, Calif. He resided in Livermore, Calif., at the time he filed his petition in docket No. 715-68. Lawrence filed joint returns with Marian Evelyn Bakken, his wife, for the taxable years 1965 and 1966 with the district director of internal revenue, San Francisco, Calif. Marian Evelyn Bakken did not sign the petitions and is not a party to these consolidated proceedings.

Lawrence has a bachelor of civil engineering degree and a master of science in civil engineering degree from the University of Minnesota. He is a licensed mechanical and civil engineer in California. Since 1961, he has been employed by the Sandia Corp. (hereinafter referred to as Sandia) as an engineer. Sandia is an atomic weapons ordnance contractor for the Atomic Energy Commission. Sandia is managed by the Western Electric Co. of the Bell Telephone System on a nonprofit basis for the Atomic Energy Commission. Its employees are required to have an AEC Q-level secret clearance in order to engage in the designing of atomic weapons. Lawrence's duties for Sandia consist of analyzing engineering problems associated with weapons ordnance, including problems dealing with flight dynamics, impact, and structural analysis by computer programing. He acts as a technical consultant to project groups in the Sandia laboratory. In 1964 his job description read in part as follows:

TITLE: STAFF MEMBER—TECHNICAL
STRUCTURAL DYNAMICIST

OBJECTIVE:

To conduct detailed theoretical analyses of complex problems in shock and vibration and related areas of structural dynamics, lending support for the various other engineering organizations.

KNOW-HOW:

The Structural Dynamicist conducts both theoretical and practical analyses of weapon systems and elements. To accomplish the objectives of the position, the dynamicist must be intimately familiar with the mathematical modeling and analysis of multiple-degree-of-freedom, non-linear systems which are excited by

shock transients and vibratory inputs. He must also be familiar with the practical aspects of interpreting the results of his analyses in terms of the parameters of a real system. Familiarity with computer methods is required to solve the differential equations arising in these analyses.

The training for this position typically requires a minimum equivalent of a Master of Science degree with specialized emphasis on vibration analysis.

*Primary Responsibilities of This Position.*—Active participation in feasibility studies, design, development and test, including the following:

1. Carrying out dynamic studies on design proposals to determine the ability of a system or component to survive its expected environment,

2. Gathering and analyzing general dynamic environmental information,

3. Assisting in the selection of adequate design and test parameters,

4. Keeping informed of improved test methods and controls to better evaluate the adequacy of dynamic tests.

PROBLEM SOLVING:

1. Assisting the structural analyst, project representatives and outside agencies in the definition of dynamic environmental requirements, and needed dynamic analyses.

2. Assisting in the development of systems which are adequate for dynamic environment through:

(a) coordinating with the structural analyst and project representatives in defining trouble areas and associated dynamic systems,

(b) working with the structural analyst in computing descriptive dynamic parameters of the system,

(c) devising experimental means to collect unknown parameters or to clarify ambiguous areas, then working with project and test representatives in measuring the desired information,

(d) conducting necessary theoretical analyses of the system and interpreting results as necessary to all interested parties,

(e) proposing design solutions to predicted problem areas.

3. Maintaining pace with the latest developments in the profession—continuously improving methods of analysis.

ACCOUNTABILITY:

This position contributes considerable influence to the character and structural integrity of assigned projects. The responsibility for these contributions includes the accuracy of analytical work and judgment where errors can result in substantial hardware expense and lost time.

Lawrence attended the University of California at Berkeley from the 1960 fall semester to January 1964 for the purpose of pursuing a Ph. D. degree in civil engineering. From June 1961 until sometime in the fall of 1963 Sandia allowed Lawrence time off from work to attend classes during the day and paid for half his tuition for all completed courses. Sandia considered these advanced engineering courses would be helpful to petitioner in his employment.

At some time prior to January 1964, Lawrence became acquainted with Howard C. Merchant (hereinafter referred to as Merchant) who was also employed by Sandia. Merchant, who had lawyers in his family, talked about becoming a lawyer. He also discussed taking the law school aptitude test. Lawrence decided to take the aptitude test to determine whether he or Merchant had the higher I.Q.

Around February 1964, Lawrence became aware that his employment status at Sandia was threatened. He was concerned that his supervisor spoke to a meeting with respect to his analyses of structural dynamics problems. He felt that his supervisor insisted on speaking for him because he himself did not possess skill in communicating his ideas to others. Lawrence was excluded from conferences and inquiries in the areas of his special knowledge. He felt his isolation from management was damaging his job incentive. His exclusion, he felt, was the result of disappointment in his abilities of self-expression and logical reasoning. He came to the conclusion that his job was threatened not because he lacked the requisite engineering ability but because he was unable to communicate his ideas to others, and was not enough of an extrovert to sell his services as consultant to the company's project groups.

Under the impact of this realization, Lawrence submitted his application to the University of Santa Clara Law School in the hope of developing practice in self-expression and logical reasoning. He believed the discipline of the case system study of law and of class recitation would provide him with the abilities he lacked and which he felt were requisite to his continued employment as an engineer at Sandia.

In connection with his admission to Santa Clara, Lawrence completed a health history form. For his "Intended Occupation" he specified "law and engineering." In the fall of 1964, Lawrence enrolled as a candidate for the degree of juris doctor in the evening division of the Santa Clara Law School while maintaining his regular full-time employment as a technical staff member at Sandia.

On November 2, 1964, Lawrence registered with the Committee of Bar Examiners of the State Bar of California. In filling out the registration form he indicated his intention to graduate from Santa Clara as means of fulfilling the legal education requirement to take the bar examination.

Lawrence pursued a full course of study leading to the degree of juris doctor. Santa Clara does not allow auditing of its law classes. Only persons taking the minimum course load leading to a final degree are permitted to attend classes.

After his entrance into law school, Lawrence's job status continued to decline. Because of the sensitivity of its research to Government security, Sandia preferred not to fire its employees. Instead it resorted to a system of job evaluation to induce the resignation of unsatisfactory employees. Sandia's position with respect to Lawrence became explicit when Lawrence received a performance evaluation in March 1965. The evaluation, based on an organization-wide merit review, was the result of a collective evaluation. Lawrence's supervisor,

Arlyn N. Blackwell (hereinafter referred to as Blackwell) wrote the evaluation. Its pertinent provisions follow:

Your performance has not been rated well in the past 8100 merit reviews. Therefore, I am writing this letter to discuss, as best I can, the reasons for this; propose a plan for improving the situation; and outline job assignments to implement this plan.

*Reasons.*—Let me start out by reiterating many of the comments I have made in our past performance evaluation interviews. I think your strong points are: you are not afraid of work; you have a good academic background; you are aggressive; and are willing to take responsibility. However, most of the difficulty seems to come from your dealings with your customer, largely caused by incomplete communications. The following points are more specific reasons which contribute to this difficulty. It appears that you are:

1. not following the problem solution to make sure it fits the customer's needs and time scales.

2. allowing special interests to side track the main issue of the problem, working on the most interesting or sophisticated parts of the problem rather than important problems—working the wrong problem.

3. making problems more difficult than they actually are—using related solutions from the literature (which sometimes are not applicable) as a crutch instead of relying on first principles and your own ability.

4. being overly intolerant of the weaknesses of others, such as smoking or talking.

These are very general statements and do not apply to every situation, but I believe there are specific examples to support each of them. One cannot pick out any one reason for lack of support in merit reviews because each customer is probably influenced by a different set of circumstances.

*Plan.*—The situation must improve and I would like to help. There are at least two obvious ways to attack the problem—(1) concentrate on improving these difficulties in your present assignment or (2) change to a job where these considerations are less important.

If you prefer the first approach (your present assignment), you should concentrate on satisfying the customer. This can only come with complete communication throughout the work. Be sure (1) that a problem exists, (2) that you understand what the customer needs and wants, (3) that the customer knows what you are going to do for him (so he doesn't expect more than you can do), and (4) that the work you do satisfies his needs and time scales.

If you prefer the second approach (a different job), I would recommend that you consider transferring to an assignment where there are fewer customers and deadlines to meet. I would suggest that you look for a position in the test department where you could exercise your interests in actual hardware and instrumentation development problems. To accomplish such a relocation, I would provide such assistance as I am able; however, you must realize there would have to be a mutual acceptance between yourself and supervision in the area under consideration.

\*        \*        \*        \*        \*        \*        \*

*Summary*—I think you have to make a decision. If you wish to stay in this group, you must undertake this campaign to improve the acceptance of your work by your customers. This will not be easy, since people have already formed opinions which must be changed. Therefore, you will have to do an especially good job to gain the recognition and acceptance required.

You should also consider the possibility of transferring to a new job, possibly in the test department.

Let us plan to have a formal review of progress in about four months, say in July. I will expect to see substantial improvement in customer satisfaction and net accomplishments during this period.

While Blackwell recommended that Lawrence undertake some program of self-improvement, he did not advise Lawrence to undertake additional training or formal education of any nature. He did not advise Lawrence to attend law school, and was first aware that Lawrence was attending law school after he was enrolled and was attending classes. In response to inquiry from the Internal Revenue Service as to whether Lawrence's difficulties at Sandia were attributable to a lack of training or education, or to personality characteristics or attitudes, Blackwell stated:

His difficulties were, in my opinion, due to lack of technical insight and communication skills in his dealings with the people his work supported. I believed at the time that awareness of the problem combined with experience and practice would have been the best cures for these problems, particularly the first. However, any training which improved communications and interpersonal skills would have been a significant consideration. Whether law school was the best approach to this facet of the problem is debatable, and I'll leave that judgment to you. Mr. Bakken is no longer under my supervision, but I do know that his performance has improved.

In the summer of 1966, Lawrence discussed with C. T. Ross, Jr., general attorney at Sandia, the possibility of his becoming employed as an attorney for Sandia once he had completed his law schooling at the University of Santa Clara. He was advised that Sandia had no openings on its legal staff and that he might apply to Western Electric Co., Sandia's parent company, for a legal position. Lawrence has continued with Sandia in his engineering position. His job status has improved and he intends to remain with Sandia.

Lawrence deducted $1,583 and $1,912 on his individual income tax returns for 1965 and 1966, respectively, as "Other Deductions"— "University Santa Clara law school tuition, texts and travel expenses." In his statutory notice of deficiency for the taxable year 1965, the Commissioner disallowed the claimed deduction with the explanation:

It is held that the amount of $1,583.00 which represents your expenses while attending the University of Santa Clara School of Law in the year 1965 does not qualify as a deduction for educational expenses under section 1.162–5 of the Regulations to the Internal Revenue Code.

The claimed education expense deduction on his 1966 return was similarly disallowed.

OPINION

Petitioner seeks to deduct the educational expenses of attending law school incurred by him in 1965 and 1966. He relies on section 162, I.R.C.

1954,[1] and section 1.162–5 of the regulations issued in 1958 which provide:

SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

Sec. 1.162–5 Expenses for education.

(a) Expenditures made by a taxpayer for his education are deductible if they are for education (including research activities) undertaken primarily for the purpose of:

(1) Maintaining or improving skills required by the taxpayer in his employment or other trade or business, or

(2) Meeting the express requirements of a taxpayer's employer, or the requirements of applicable law or regulations, imposed as a condition to the retention by the taxpayer of his salary, status or employment.

Whether or not education is of the type referred to in subparagraph (1) of this paragraph shall be determined upon the basis of all the facts of each case. If it is customary for other established members of the taxpayer's trade or business to undertake such education, the taxpayer will ordinarily be considered to have undertaken this education for the purposes described in subparagraph (1) of this paragraph. Expenditures for education of the type described in subparagraph (2) of this paragraph are deductible under subparagraph (2) only to the extent that they are for the minimum education required by the taxpayer's employer, or by applicable law or regulations, as a condition to the retention of the taxpayer's salary, status, or employment. * * *

(b) Expenditures made by a taxpayer for his education are not deductible if they are for education undertaken primarily for the purpose of obtaining a new position or substantial advancement in position, or primarily for the purpose of fulfilling the general educational aspirations or other personal purposes of the taxpayer. The fact that the education undertaken meets express requirements for the new position or substantial advancement in position will be an important factor indicating that the education is undertaken primarily for the purpose of obtaining such position or advancement, unless such education is required as a condition to the retention by the taxpayer of his present employment. In any event, if education is required of the taxpayer in order to meet the minimum requirements for qualification or establishment in his intended trade or business or specialty therein, the expense of such education is personal in nature and therefore is not deductible.[2]

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise specified.

[2] Sec. 1.162–5, as above quoted, was issued in 1958. In 1967, the Commissioner revised sec. 1.162–5. The 1967 amendment of sec. 1.162–5 was published as T.D. 6918, 1967–1 C.B. 36. While the amended section exclusively is applicable to the taxable years beginning on or after Jan. 1, 1968, taxpayers may rely on either the 1958 or the 1967 regulations for certain prior taxable years, including those in issue here. Rev. Rul. 68–191, 1968–1 C.B. 67.

Petitioner relies on the 1958 regulations.

The 1967 regulations provide that all expenditures for education which either maintains or improves skills required by the taxpayer in his employment or meets the express requirements of the individual's employer are deductible except for expenditures which are either "for education which is required of him in order to meet the minimum educational requirements for qualification in his employment" or which are "for education which is a part of a program of study being pursued by him which will lead to qualifying him in a new trade or business." The amended regulations provide that expenditures which fall within either of the two specified categories are "personal expenditures or constitute an inseparable aggregate of personal and capital expenditures and, therefore, are not deductible as ordinary and necessary business expenses even though the education may maintain or improve skills required by the individual in his employment or other trade or business or may meet the express requirements of the individual's employer or of applicable law or regulations."

Petitioner has not argued that the deduction should be allowed under section 1.162–5(a)(1)[3] of the 1958 regulations. Instead, he has narrowly confined his argument to section 1.162–5(a)(2). He has undertaken to persuade us that the expenditures for his law school education were undertaken primarily for the purpose of meeting the express requirements of his employer, imposed as a condition to the retention by him of his salary, status, or employment.

Petitioner contends that his performance evaluation was tantamount to an express requirement that he "shape up or ship out." We agree that he was required, at the peril of losing his employment status, to make some efforts leading to the improvement of his job performance. While the state of evidence relevant to his subjective intentions in pursuing the study of law is less than satisfactory, we believe that Lawrence did not undertake to study law for the purpose of preparing himself for a new profession or a substantial advancement in position or to fulfill his general educational aspirations. As to his subjective intention, Lawrence testified:

I enrolled in law school for the sole reason of subjecting myself to the pressure cooker environment to develop practice in self-expression and logical reasoning. The law curriculum uses very factual situation[s] of case method and searching for the relation of various crucial issues and requires the students to express themselves in class recitation.

I felt that I needed this to preserve my employee status and to fulfill a bona fide business purpose of my employer in making me a better engineer.

---

Undoubtedly, petitioner chose not to rely on the 1967 regulations since his education expenses were for education which is a part of a program of study being pursued by him which led to qualifying him in the new trade or business of being a lawyer. Such expenditures are clearly nondeductible under the 1967 regulations.

[3] Petitioner on brief "readily concedes" that legal skills were not required of him in his employment and that it is not customary for other persons similarly employed to undertake legal education for the purpose of improving their employment skills! He concludes from these facts that his education was not undertaken primarily for the purpose of maintaining or improving skills required by him in his employment. We note that petitioner was undoubtedly correct in disqualifying himself under sec. 1.162–5(a)(1) on the facts of ths case. We note it is not customary for other persons in similar employment to undertake like education. The "skills" required by petitioner at Sandia were engineering, not legal skills. We do not think that "self-expression" or "logical reasoning" are employment "skills" within the meaning of sec. 1.162–5(a)(1). Expenditures for the attainment of such abilities as these we think are in the nature of personal and capital expenditures. As this Court recently said, "The regulations allow a deduction for education that maintains or improves *skills,* but what we have in this case is an education designed to increase the petitioner's general understanding and competency." *James A. Carroll,* 51 T.C. 213 (1968). Before educational expenditures will be considered ordinary and necessary business expenses under sec. 162, it must be established that they bear a proximate and direct relationship to the taxpayer's trade or business. *Kornhauser* v. *United States,* 276 U.S. 145, 153 (1928) ; *Robert Lee Henry,* 36 T.C. 879, 884 (1961) ; Rev. Rul. 61–133, 1961–2 C.B. 35, 36 ; *James A. Carroll, supra.* We conclude, then, with petitioner that the expenditures are deductible, if at all, only if they were for education undertaken primarily for the purpose of meeting the express requirements of his employer, imposed as a condition to the retention by him of his salary, status, or employment.

I feel that the objectives of law school are more than preparing one to become an attorney, in other words, to take on a skill and a profession.

I believe that the study of the law is necessary for understanding human actions and human reactions and that the case method and the problem method and lecture techniques that one would learn from in the law school curriculum would develop a talent or teach a talent where one would have to make a perceptive analysis of facts and develop a discipline of directed thinking and analytic powers essential to being able to conduct an independent effort in engineering as well as any profession.

Expenditures for education undertaken primarily for the purpose of meeing the express requirements of the taxpayer's employer are deductible, the regulations tell us, "only to the extent that they are for the minimum *education required by the taxpayer's employer* * * * as a condition to the retention of the taxpayer's salary, status, or employment." (Emphasis supplied.) In other words, there must be an *express education requirement.*

Sandia did not expressly require Lawrence to undertake any program of study. Indeed, Blackwell, his supervisor, was unaware of Lawrence's plan to attend Santa Clara until after he was enrolled and attending classes. Further, Blackwell expressed his personal belief that Lawrence's awareness of his lack of technical insight and communication skills combined with experience and practice would have been the best cures for his job difficulties. In these circumstances, we hold that the expenditures are not deductible under the authority of section 1.162–5(a)(2), Income Tax Regs.

We hold the expenditures do not bear a proximate and direct relationship to Lawrence's employment and are not deductible business expenses under section 162. At best the expenditures were for education that would be of some help to Lawrence on his job. While his primary subjective intention may have been to receive that little assistance, which he felt was necessary, this alone does not establish a sufficient nexus between the job and the education expenditures.

*Decisions will be entered for the Commissioner.*